RECORD NO. 12-7099

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals
### For The District of Columbia Circuit

## MICHAEL QUEEN,

*Plaintiff – Appellant*,

**v.**

## ED SCHULTZ,

*Defendant – Appellee*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

## PAGE-PROOF BRIEF OF APPELLEE

_____

**John C. Hayes, Jr.**
**NIXON PEABODY LLP**
**401 9th Street, N.W., Suite 900**
**Washington, D.C.  20004**
**(202) 585-8345**

*Counsel for Appellee*

# UNITED STATES DISTRICT COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| MICHAEL QUEEN | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | |
| | ) | |
| vs. | ) | Case No. 12-7099 |
| | ) | |
| ED SCHULTZ | ) | |
| | ) | |
| Defendant/Appellee. | ) | |
| _____ | ) | |

# DEFENDANT-APPELLEES'
## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

All parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellee.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF ISSUES ......................................................................1

STATUTES AND REGULATIONS ..........................................................1

STATEMENT OF THE CASE .................................................................1

STATEMENT OF FACTS ........................................................................1

SUMMARY OF ARGUMENTS ...............................................................9

STANDARD OF REVIEW .....................................................................10

ARGUMENT .........................................................................................12

    I.     THE DISTRICT COURT CORRECTLY HELD THAT
         THERE WAS NO VALID AND ENFORCEABLE
         CONTRACT BETWEEN SCHULTZ AND QUEEN ......................12

        A.    THE ALLEGED CONTRACT IS UNENFORCEABLE
             BECAUSE IT IS UNCERTAIN AND THERE WAS NO
             AGREEMENT AS TO MATERIAL TERMS ........................12

             1.     The alleged contract is generally uncertain ...................13

             2.     The contract is uncertain because there is no
                  agreement to the *amount* of Queen's compensation ......15

             3.     The contract is uncertain and there is no agreement
                  as to the *type* of compensation........................................18

             4.     The contract is uncertain and there is no agreement
                  as to the nature of the subject TV show .........................19

i

5.    The contract is uncertain as to the performance required of Queen ...........................................................21

6.    Plaintiff's Brief consists of erroneous arguments bolstered by mischaracterized evidence to overcome the *certainty* requirements of an enforceable contract........................................................23

B.    THE CONTRACT IS UNENFORCEABLE BECAUSE THERE WAS NO INTENT TO BE BOUND..........................24

II.    THE DISTRICT COURT CORRECTLY HELD THAT THERE WAS NO VALID AND ENFORCEABLE PARTNERSHIP AGREEMENT BETWEEN SCHULTZ AND QUEEN ..............................................................................................29

1.    Because there is no evidence of co-ownership, there are no facts supporting formation of a partnership........................30

2.    Queen's argument in support of partnership formation also fails because there is no genuine issue of material fact about Schultz's intent.........................................................31

a.    The District Court correctly found Queen failed to create a genuine issue of fact about whether the parties intended to form a partnership ...........................31

CONCLUSION .......................................................................................35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*1836 S. St. Tenants Ass'n, Inc. v. Estate of B. Battle*,
  965 A.2d 832 (D.C. 2009) ...................................................................25

*Al-Mendi v. D.C. Publ Schs.*,
  2005 WL 3272075 (D.D.C. Dec. 2, 2005) ...................................................11

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ..............................10

*Beckman v. Farmer*,
  579 A.2d 618 (D.C. 1990) ...................................................................31, 33

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ..............................10

*Chase & Co. v. White, Weld & Co.*,
  311 F. Supp. 1253 (S.D.N.Y. 1970) ............................................................32

*Chung v. Washington Metro Area Trans. Auth.*,
  2007 WL 1154084 (D.D.C. Apr. 18, 2007)...................................................11

*Cooter & Gell v. Hartmax Corp.*,
  496 U.S. 384 (1990)...............................................................................11

*Duffy v. Duffy*,
  881 A.2d 630 (D.C. 2005) ...................................................................12, 25

*Dyer v. Bilaal*,
  983 A.2d 349 (D.C. 2009) ............................................................13, 24, 25

*Edmund J. Flynn Co. v. LaVay*,
  431 A.2d 543 (D.C. 1981) ...................................................................13, 29

*Chief Authorities are Designated with an Asterisk*

*Fields v. Office of Johnson*,
    520 F. Supp. 2d 101 (D.D.C. 2007)..............................................................11

*In re KeyTronics*,
    744 N.W.2d 425 (Neb. 2008) ......................................................................30

*Jack Baker Inc. v. Office Space Dev. Corp.*,
    664 A.2d 1236 (D.C. 1995) ............................................................. 12-13, 29

*Malone v. Saxony Coop. Apts.*,
    763 A.2d 725 (D.C. 2000) ..........................................................................12

*Modern Elec., Inc. v. Ideal Elec. Sec. Co.*,
    81 F.3d 240 (D.C. Cir. 1996)......................................................................11

*Rosenthal v. Nat'l Produce Co.*,
    573 A.2d 365 (D.C. 1990) ..........................................................................13

*Simon v. Circle Assocs., Inc.*,
    753 A.2d 1006 (D.C. 2000) ........................................................................12

*Sims v. Westminster Investing Corp.*,
    648 A.2d 940 (D.C. 1994) ..........................................................................12

*U.S.A. v. Microsoft Corp.*,
    253 F.3d 34, 346 U.S. App. D.C. 330 (D.C. Cir. 2001)..............................11

*Waterhouse v. District of Columbia*,
    298 F.3d 989 (D.C. Cir. 2002)....................................................................10

**STATUTES**

D.C. Code § 29-602.02(c)(3) ...............................................................................1, 33

D.C. Code § 33-102.2(c)(3) .................................................................................1, 32

**RULES**

Fed. R. Civ. P. 52(a)..............................................................................................1, 11

Fed. R. Civ. P. 56(c)..................................................................................................10

## STATEMENT OF ISSUES

1.      Whether the district court correctly found that Michael Queen ("Queen") failed to establish a genuine issue of material fact regarding the formation of an enforceable partnership agreement.

2.      Whether the district court correctly dismissed Queen's contract claims because there was no agreement on material terms.

3.      Whether the district court correctly dismissed Queen's contract claims because there was no intent to be bound.

## STATUTES AND REGULATIONS

Relevant statutes and regulations are already set forth in the Appellant's brief.  Queen has cited D.C. CODE § 33-102.02(c)(3) (2001), which has been repealed.  Ed Schultz ("Schultz") also cites Fed. R. Civ. P. 52(a); D.C. CODE § 29-602.02(c)(3).

## STATEMENT OF THE CASE

Schultz is satisfied with Queen's statement of the case.

## STATEMENT OF FACTS

In January 2008, Queen met Schultz for the first time when Queen gave Schultz a tour of the NBC building in Washington, D.C.  Compl. ¶9.  It was during that tour that Queen pitched the idea of a television show to Schultz.  *Id.*  ¶¶10, 11. Schultz expressed interest, and Queen subsequently began developing and pitching

the show.  Queen asked a former co-worker, Max Schindler, to help develop the

show.  *Id.* ¶¶14, 16-18; Schindler Decl. ¶2, Docket 24-1 at 1.  Between March and

May 2009, Queen, Schultz and Schultz's attorney, Jeffrey Landa ("Landa"),

engaged in telephone and e-mail communications in an attempt to negotiate a

contract that would govern Schultz and Queen's relationship.  Compl. ¶¶19-26, 28-

30, 45-48; Pl's 1st Opp'n Exs. 1, 3, 4, 6, 9, 11, 14, Docket 24-4 at 2, 15, 17, 22, 28,

32, 39; Landa 11/1/11 Decl. Exs. 11, 17, Docket 25-1 at 37, 50.

On March 3, 2008, Queen admitted to his "associate," attorney Susan

O'Connell that he had no contract with Schultz.  *Id.* Ex. 1, Docket 25-1 at 8.  On

March 5th, Schultz wrote Queen insisting on control and saying, "I will agree to a

50/25/25 percentage formula of profits after expenses of the show."  Plt's 1st

Opp'n, Ex. 1, Docket 24-4 at 2.  On March 10th, under subject, "**Take a look**…"

Queen sent Schultz what he contemporaneously described as a *tentative*

*agreement*, which he now alleges was a firm agreement.  Landa 11/1/11 Decl. Ex.

2, Docket 25-1at 10  (emphasis in original); *see tentative agreement*, *Id.* Docket

25-1 at 11-19, Ex. 2.  The next day, March 11th, Schultz advised Queen that he had

forwarded the *tentative agreement* to Landa.  *Id*. at 21, Ex.3.  Later that day,

Schultz rejected the *tentative agreement* by forwarding Landa's criticisms and

request not to sign it to Queen.  *Id.* at 23, Ex. 4.

On March 16, 2008, Landa advised Queen that he "**would agree**" to having Schultz sign a letter of understanding by which Schultz, Queen and Schindler "**would agree** to form a partnership or corporation . . . for any [TV] broadcast opportunities that occur as a result of this agreement." Landa further stated that "**Articles of incorporation and/or final terms of the partnership agreement will be negotiated and executed within the next thirty days**." Plt's 1st Opp'n, Ex. 14, Docket 24-4 at 39 (emphasis added). Neither of the contemplated documents were executed within thirty days or at any other time. Schultz Decl. ¶2, Docket 31-2 at 1-2. Later that day, Landa sent Queen a superseding e-mail entitled *Proposed Agency Agreement* which was limited to "exclusive authority to negotiate a television show with CNN [based on Schultz's radio show]". It also said that if Queen and Schindler obtained an acceptable offer from CNN, Schultz would "enter into an exclusive agreement with them for the production of that show at terms to be negotiated. . . ." Plt's 1st Opp'n, Ex. 3, Docket 24-4 at 15. Queen and Schindler failed in that endeavor.

Sometime after March 16, 2008, Schindler left the project, stating that he did not trust Schultz because of his refusal to sign a contract. Schindler Decl. ¶3, Docket 24-1 at 1.

On April 5, 2008, Schultz wrote, "[he] will not do a TV deal without [Queen's] involvement and that includes financial involvement." It was devoid of

any material terms.  Plt's 1st Opp'n, Ex.4, Docket 24-4 at 17.  During this time frame, Schultz and Queen were trying to develop a syndicated Sunday morning show which they would finance, own and produce.  Landa 11/1/11 Decl. Ex. 18:¶2 (May 10, 2009, Schultz letter to Queen), Docket 25-1 at 52 (caps in original):

> Mike, you and I were working on producing a Sunday morning show. It was agreed you would be working on that show.  You are not working on the "Ed Show" now.  You would also have had part ownership in the show which we talked about.  You and I had numerous conversations about getting an agreement IF, IF the money was raised.  The money was NEVER raised.  There was no need for an agreement because there was no show.  Air America approached me, I tried to work the deal that included you.  It fell through.  Our efforts were for a show that you and I would own and operate.  That is still a possibility.  But Mike , that show never happened.  [*see also* Schultz Decl. ¶¶3-5, Docket 20-3 at 1-2.

Queen alleges there was a March 5, 2008 contract which provided for a 50/25/25 split of ownership.  Compl. ¶21.  Schultz and Queen's subsequent negotiations encompassed a variety of proposals, *e.g.*, on May 29, 2008, Queen requested "equal ownership" and "10% of Schultz's salary" in "any contract" that Landa "could put together."  Landa 11/1/11 Decl., Ex.5, Docket 25-1 at 25.

On June 1st, Landa, on behalf of Schultz, rejected Queen's request for 30% ownership in writing.  *Id.* at 29, Ex. 7.  Landa again rejected Queen's proposal on June 6th, writing "**30% ownership by you is out of the question**" and "**Ed is not interested in having your 'salary' based on his 'salary.'**"  Plt's 1st Opp'n, Ex. 9, Docket 24-4 at 28 (emphasis added).

4

The decision to produce a pilot featuring Schultz was made sometime prior to May 30, 2008.  On May 31st, Queen advised Schultz that he was "willing to go forward [with the Pilot] without a signed contract on condition that [Schultz] will cover all costs of production."  Landa 11/1/11 Decl., Ex. 6, Docket 25-1 at 27.  On June 7th and June 8th, Schultz and Queen reiterated their intent to go forward with production of the pilot if Schultz paid all costs.  Schultz said he would go forward with a "structured deal down the road **if the show has potential**."  Plt's 1st Opp'n, Exs. 10, 11, Docket 24-4 at 30, 32 (emphasis added).  An agreement never materialized and neither did the contemplated show.  Schultz Decl. ¶2, Docket 20-3 at 1-2.

Prior to July 28th, Queen contacted Allan Horlick ("Horlick"), general manager of WUSA, the CBS affiliate in Washington, D.C., to explore the possibility of bringing the Ed Schultz [radio] show to television.  Landa 11/1/11 Decl. Ex. 8 (Queen e-mail to Krausz), Docket 25-1 at 31.

That same day, Diane Krausz, who was advising Queen on the Horlick project, asked Queen if he had a formal deal with Schultz.  *Id.* Ex. 8 (Krausz e-mail to Queen), Docket 25-1 at 31.  Queen admitted there was none, but replied there was an agreement in principal via e-mails.  He further lamented that "it would be much better to have a formal agreement."  *Id.* Ex. 9, Docket 25-1 at 33.  Clearly, there was no agreement on July 28, 2008, four months after the 50/25/25 e-mail.

On August 11th, Queen again contacted Horlick.  Compl. ¶52.  The concept of the proposed Horlick deal was for Schultz and Queen to raise capital to produce and own the show and then syndicate it through WUSA.  Landa 11/1/11 Decl. Ex. 18:¶¶3, 4, Docket 25-1 at 52.  This was confirmed by O'Connell's husband in a May 29, 2009 e-mail to Queen entitled "ED DEAL RECAP for MQ."  *Id.* Ex. 19:¶4 (Option 2), Docket 25-1 at 54.

On or about September 2, 2008, Queen and O'Connell retained an attorney, Barry Skidelsky, to draft a contract to offer Schultz.  *Id.* Ex. 10, Docket 25-1at 35.

In an e-mail dated March 13, 2009, Queen asserted that an agreement entitled him to 12% of Schultz's salary, not 25% ownership as previously alleged.  Notably, Queen conceded that he was not aware whether the *agreement* pertained to "the MSNBC opportunity" or whether the "12%" pertained to remuneration derived from Schultz's salary.  *Id.* Ex. 11, Docket 25-1 at 37.

On March 21, 2009 there was a published report that MSNBC was having discussions with Schultz regarding joining the network full-time.  *Id.* Ex. 12, Docket 25-1 at 39-40.  This was about one year after Queen alleged he contacted Phil Griffin ("Griffin"), President of MSNBC.  Queen Decl. ¶24, Docket 24-3 at 6.

At the end of March, Griffin called Schultz and offered him a TV show.  Schultz accepted.  He began hosting MSNBC's *The Ed Show* on April 6, 2009.  Compl. ¶67, Answer ¶67.  Schultz has no ownership interest in *The Ed Show*

which is owned, operated and produced by MSNBC. Schultz appears on the show as an independent contractor pursuant to a contract between Ed Schultz Productions, LLC and MSNBC. Schultz Decl. ¶¶6, 8, 9. Docket 31-2 at 2.

On March 29, 2009, Queen told O'Connell that "[o]bviously it would have been better if all concerned had in advance written contracts clearly spelling out everything." Landa 11/1/11 Decl. Ex. 13, Docket 25-1 at 42. Clearly, there was no agreement on March 29, 2009, a year after the 50/25/25 email.

Schultz never agreed to pay a salary or commission to Queen. He never agreed to give Queen an ownership percentage in any television show or project. Schultz Decl. ¶10, Docket 31-2 at 2. Schultz never agreed to Queen's involvement with MSNBC's *The Ed Show*. Queen had no such involvement. *Id.* at 2:¶¶5, 6.

On April 1, 2009, Queen asked Schultz to mention his name on the air so he could raise his profile with NBC. Landa 11/1/11 Decl. Ex. 14, Docket 25-1 at 44. On April 2nd, Queen complained to O'Connell that Schultz had not complied with that request. He also told O'Connell he was "hoping for a small percentage of Schultz's $300K" salary but "with no written agreement . . . all bets are off." *Id.* Ex. 15, Docket 25-1 at 46.

On April 13th, thirteen months after the 50/25/25 e-mail, Queen told O'Connell he was hiring attorney Lisa Geier to draft a contract to offer Schultz. *Id.* Ex. 16, Docket 25-1 at 48.

7

On May 10, 2009, Queen e-mailed Schultz stating ". . . we are overdue for a *written agreement*."  He went on to say their agreement called for a "12% stake in the partnership" which he defined as "12% of gross income from TV Show. . . ." *Id.* Ex. 17, Docket 25-1at 50.  Schultz contradicted Queen that same day, stating that their negotiations pertained to a Sunday morning show that would employ Queen if they could raise the production money.  Schultz emphasized that Queen was not part of MSNBC's *The Ed Show*.  *Id.* Ex. 18, Docket 25-1 at 52.

Finally, on May 29, 2009, O'Connell's husband sent Queen his "ED DEAL RECAP for MQ."  He described as *Option 1* that Queen's team would get 12% of Schultz's salary if they "found a TV show for Ed to host and he accepted a contract as a result."  He also described as *Option 2* that if Queen's team "created a show for Ed to host" there would "likely [be] jobs provided" and Schultz would own 70%.  *Id.* Ex. 19 (*Option 1*; *Option 2*) Docket 25-1 at 54.  He went on to say that after *Option 1* fell through, Queen's team concentrated on *Option 2*, the "Horlick deal."  *Id.* Ex. 19, Docket 25-1 at 54.

Neither Queen nor Schultz held themselves out to third persons as partners, nor did Queen file partnership documents required by the Internal Revenue Service, the District of Columbia or New York.  Def's Mat'l Facts To Which There Is No Genuine Issue, ¶¶13, 14, 15, 16, Docket 20-1 at 2-3; *see also* Landa 10/12/11 Decl. ¶¶2-6, Docket 20-2 at 1-2.

8

## SUMMARY OF ARGUMENTS

Queen's contract claims fail on two grounds.  First, there was no meeting of the minds on any material terms, including *amount* and *type* of compensation, Queen's job performance, nature and characterization of the contract, or even subject matter.  Second, there was no evidence of Schultz's intent to be bound.  In fact, the District Court found that there was evidence that neither Schultz nor Queen intended to be bound without a written contract.

Queen's partnership claim also fails on two grounds.  First, as a matter of law, a requisite to partnership is co-ownership, and Schultz has no ownership interest in MSNBC's *The Ed Show*.  Second, there is no evidence of any indicia of a partnership, e.g. sharing of profit and loss, capital contribution, or control.

The District Court correctly disregarded Queen's self-serving, conclusory declaration and found that the e-mails relied on by Queen were mischaracterized and were, at most, agreements to agree.  More significant, the District Court found that all of Queen's evidence was trumped by his March 10, 2009 and March 13, 2009 correspondence to Schultz wherein he expressed confusion about the very crux of the litigation.  Queen did not know if the "agreement" pertained to MSNBC's *The Ed Show*, and he did not know if his remuneration was to be a percentage of Schultz's salary.

As damaging as Queen's communications were, his testimony was more revealing.  He could not state the amount of his own compensation, whether his remuneration was to come from profits or salary, or what his job requirements were.

The District Court correctly found that the record is devoid of evidence required to establish legally cognizable claims and dismissed Queen's claims as a matter of law.  None of these factual findings were clearly erroneous.

## STANDARD OF REVIEW

Review of a district court's grant of summary judgment is *de novo*. *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). Summary judgment is only appropriate if "there is no genuine issue as to any material fact and … the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute about a material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  A moving party is "entitled to a judgment as a matter of law" if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

Under an "abuse of discretion" standard, appellate courts will "uphold any district court determination that falls within a permissible range of permissible conclusions." *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 400 (1990).  Courts of appeal distinguish between review of factual issues and review of legal issues. Findings of fact are set aside only if clearly erroneous.  Fed. R. Civ. P. 52(a); *U.S.A. v. Microsoft Corp.*, 253 F.3d 34, 52, 346 U.S. App. D.C. 330 (D.C. Cir. 2001)  Findings of fact are reviewed for clear error; issues of law are reviewed *de novo*.  *Modern Elec., Inc. v. Ideal Elec. Sec. Co.*, 81 F.3d 240, 244 (D.C. Cir. 1996).

Self-serving testimony does not create a genuine issue of material fact, especially where that testimony suggests that corroborating evidence should be readily available.  *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 106 (D.D.C. 2007); *see also Chung v. Washington Metro Area Trans. Auth.*, 2007 WL 1154084 at *3 (D.D.C. Apr. 18, 2007); *Al-Mendi v. D.C. Publ Schs.*, 2005 WL 3272075 at *5 (D.D.C. Dec. 2, 2005).

11

## ARGUMENT

I. **THE DISTRICT COURT CORRECTLY HELD THAT THERE WAS NO VALID AND ENFORCEABLE CONTRACT BETWEEN SCHULTZ AND QUEEN.[1]/[2]**

A. **THE ALLEGED CONTRACT IS UNENFORCEABLE BECAUSE IT IS UNCERTAIN AND THERE WAS NO AGREEMENT AS TO MATERIAL TERMS.**

For a contract to be valid and enforceable, District of Columbia law requires both (1) agreement as to all material terms, and (2) intention of the parties to be bound. *Simon v. Circle Assocs., Inc.*, 753 A.2d 1006, 1012 (D.C. 2000) (*quoting Sims v. Westminster Investing Corp.*, 648 A.2d 940, 942 (D.C. 1994). *See also Duffy v. Duffy*, 881 A.2d 630, 633 (D.C. 2005) (The requisite to an enforceable contract is "mutual assent of the parties to all the essential terms of the contract." (*quoting Malone v. Saxony Coop. Apts.*, 763 A.2d 725, 729 (D.C. 2000))). This is true whether the contract is written or oral. *Jack Baker Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995).

"Under District of Columbia law, the party asserting the existence of an enforceable contract has the burden of proving that there has been an agreement – a 'meeting of the minds' – as to all material terms." *Jack Baker, Inc.*, 664 A.2d at

---

[1] This discussion is equally applicable to Queen's allegations of a partnership. Mem. Opin'n Docket 37 at 29:fn15 (citations omitted).

[2] The Breach of Contract analysis is applicable to the Breach of Implied-in-Fact claim because it is a true contract containing all required elements of a binding contracts. *Id.* at 17:fn9.

12

1238.  As seen below, the District Court correctly found that Queen presented no

evidence that Queen and Schultz agreed on any material terms.  Mem. Opin'n,

Docket 37 at 21.

### 1.      The alleged contract is generally uncertain.

The District Court aptly noted that "the nature of this alleged contract also

has eluded precise definition."  *Id.* at 18.  *Rosenthal v. Nat'l Produce Co.*, 573

A.2d 365, 370 (D.C. 1990) ("A contract must be sufficiently definite as to its

material terms . . . that the promises and performance to be rendered by each party

are reasonably certain.").  "To be final, contract negotiations must include all of

the terms which the parties intended to resolve; material terms cannot be left to

future settlement."  *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C.

1981).  To meet this standard, "parties need to express their intentions so that a

court can understand them, determine whether a breach has occurred, and identify

the obligations it should enforce."  *Dyer v. Bilaali*, 983 A.2d 349, 356 (D.C. 2009).

Queen described the contract in various ways.  He called it a "valid and

enforceable verbal and written agreement through telephone calls and e-mail

exchanges . . . which entitled [Queen] to [25%] of the income after expenses of

'The Ed Show.'"  Compl. ¶80.  He said it was an "oral, written and implied in fact

contract to form a partnership for the sole purpose of pitching the concept of a TV

show featuring [Schultz] as host" and a "partnership venture."  Plt's First Opp'n,

13

Docket 24 at 24:§ 2.  Queen also said it was "an oral, written, and implied contract that was breached by Schultz entitling him to "twenty-five percent of the income after expenses of 'The Ed Show' made to defendant."  Compl. ¶¶82, 88, 92, 97, 102; Plt's Mot. Partial Sum. Judgm't, Docket No. 30 at 10.  Finally he described it as a joint venture entitling the parties to a 50/25/25 split.  Plt's Second Opp'n, Docket 32 at 33:¶3.

Queen's characterization of the contract also varied.  At times Queen claimed it was "an agreement to create, produce and pitch the show," and at other times it was an "agreement to have [Queen] develop and pitch the *concept* of a TV show with [Schultz] as host."  Plt's Mot. Partial Sum. Judgm't, Docket No. 30 at 17-18.  This uncertainty left the District Court pondering whether the contract required Queen to develop and pitch a show *on behalf of* Schultz (an agency scenario) or whether it provided that Queen would produce and pitch a show *in partnership with* Schultz (an ownership scenario).  Mem. Opin'n at 18-19.  *See* Landa 11/1/11 Decl., Ex. 18:¶¶2-3, Docket 25-1 at 52 (Schultz and Queen were working on producing an independent show); *see also Id.* Ex. 19 (ED DEAL RECAP for MQ, Option1, Option 2) Docket 25-1 at 54.

Clearly, there was no certainty as to the requirements of the alleged contract, let alone a genuine issue of material fact as to whether a contract was formed.

**2.     The contract is uncertain because there is no agreement as to the *amount* of Queen's compensation.**

The record demonstrates that there was no certainty or agreement regarding Queen's compensation largely due to Queen's own uncertainty.  Queen alleged variously from 25% of profits, to 33% of profits plus 10% of Schultz's salary, to 12% of an unspecified amount of profits or salary, to 12% of gross income, and ultimately to 25% of Schultz's *salary* rather than 25% of *profits* as initially alleged. Mem. Opin'n at 22, 23.

On March 5, 2008, Schultz expressed a *willingness* to agree to a 50/25/25 split of profits after expenses of the show.  Plt's 1st Opp'n Ex. 1, Docket No. 24-4 at 2.  The District Court correctly found that this was merely an unenforceable agreement to agree.  Mem. Opin'n at 22.  Characterization aside, it was superseded on May 29th, when Queen asked Landa to include "[e]qual ownership . . . **should you, Ed, and I enter into an agreement**," and "an amount equal to 10% of Ed's television salary for the duration of any TV production formed from this agreement."[3]  Plt's 1st Opp'n Ex. 6, Docket No. 24-4 at 22 (emphasis added). Landa, on behalf of Schultz categorically rejected Queen's proposal on June 6th, stating that "**30% ownership is out of the question**" and "**Ed is not interested in [Queen's] 'salary' being based on [Schultz's] 'salary and he is not interested**

---

[3] This May 29th e-mail demonstrates the March 5th e-mail did not constitute an agreement.

15

**in having a salary allotted to you without ongoing responsibilities (to be negotiated) on your part**.'" *Id.*, Docket 24-4 at 28, Ex. 9 (emphasis added). Queen, as late as March 13, 2009, again contradicted his current claim for 25%, stating that he was entitled to 12%. Landa 11/1/11 Decl., Ex. 11, Docket 25-1 at 37. His position changed yet again on May 10, 2009, when he asserted entitlement to "12% of gross income from [The Ed Show]." *Id.*, Docket 25-1 at 50, Ex. 17.

Queen's deposition testimony demonstrated the same uncertainty as his writings. He testified that his contract of March 3, 2008 entitled him to either 25% of profits or 25% of Schultz's salary "from the show we did together." Landa 12/26/11 Decl., Ex. 1 (Queen transcr. 142:15-143:2), Docket 31-3 at 7. "[Queen and Schultz] were discussing all kinds of different things" regarding compensation at the time they were discussing a "3-way split." *Id.*, Docket 31-3 at 7, Ex. 1 (Queen transcr. 146:4-9). Queen concluded, "[the terms of the alleged partnership] evolved over many conversations." *Id.*, Docket 31-3 at 17, Ex. 1 (Queen transcr. 441:20-22). Queen made two salient admissions that clearly justify the District Court's decision. First, on December 27, 2011, after seven months of litigation, Queen testified that he did not know the amount of his intended compensation without referring to three years of notes and e-mails. *Id.*, Docket 31-3 at 5-6, Ex. 1 (Queen transcr. 58:7-59:13).

16

Second, in his March 13, 2009 e-mail[4], Queen, in the District Court's words, expressed "clear confusion" regarding "the very questions at the heart of [his] breach-of-contract claims," *i.e.*, uncertainty about the amount of compensation and uncertainty about whether it was applicable to MSNBC's *The Ed Show*.  Mem. Opin'n at 24.

When asked why his May 10th and March 13th e-mails stated that his agreement was for 12% and he was suing for 25%, Queen testified:

> . . . I didn't focus on the numbers. . . I didn't have these numbers in a written agreement. . . I was grabbing at straws at this juncture … I just wanted to get paid for all the work I did, be it 25 or whatever. . . I agreed to 25%, I agreed to 12%. . . [Landa 12/26/11 Decl. Ex. 1 (Queen transcr. 339:2-341:8), Docket 31-3 at 14].

Queen, when asked if he ever made any agreements after May 10, 2009, that were in excess of 12%, he stated "I have no idea.  Show me something. . . I don't know."  *Id.* Ex. 1 (Queen transcr. 341:17-22), Docket 31-3 at 14.  When his own attorney tried to resurrect Queen's testimony, Queen again admitted that (1) he and Schultz "had many discussions about percentages;" (2) he "originally agreed to 25%" and (3) he also agreed to 12%.  *Id.* Exh. 1 (Queen transcr. 441:7-12) Docket 31-3 at 17.

---

[4] "We have discussed and agreed to ownership, that is my renumeration (sic) would be 12%.  Does that apply to the MSNBC opportunity as well?  In other words, would my pay come from that percentage of your salary?"  Landa 11/1/11 Decl. Ex. 11, Docket 25-1 at 37.

On appeal, for the first time, Queen advanced another contention, that his compensation is to "split the profits from [the show's] sale 50/25/25."[5]  Plt's Init'l Brief at 18.  In support, Queen relies on his declaration, which is merely a self-serving statement that the contract calls for a 50/25/25 split.  Plt's 2nd Opp'n, Ex. 2 (Queen Decl. ¶8), Docket 32-2 at 3.  Queen also refers to Schultz's March 5, 2008 e-mail, which Queen says describes "what [Queen] **might** get paid" and that Schultz said he "**w[ould] agree** to a 50/25/25 percentage formula of profits after expenses of the show."  *Id.* ¶9 (emphasis added), Docket 32-2 at 3.  The District Court discounted this as an "agreement to agree."  Mem. Opin'n at 22.  Further, on its face, it pertains to profits from operations, not from a sale, which Queen now argues in this appeal.  Plt's Init'l Brief at 18. In short, the District Court's determination that there was no agreement as to the amount of compensation was correct.  *Id*.

### 3. The contract is uncertain and there is no agreement as to the *type* of compensation.

The *type* of compensation Queen claims entitlement to is as uncertain as the *amount*.  Queen sometimes avers that his compensation was to be based on percentage of profits, sometimes on a percentage of Schultz's salary, and sometimes on a percentage of profits plus a percentage of Schultz's salary.  *Id.* at

---

[5] Remarkably, Queen never identifies the Phantom third party who replaced Schindler after his departure in March 2008.

24.  On appeal, Queen adds a fourth alternative, "a split of the profits" from "the sale of the show."  Plt's Init'l Brief at 18.

The District Court concluded that there was no evidence "suggesting that the parties ever settled on a type of compensation for [Queen]." It also found that "Landa's June 6, 2008, e-mail to [Queen] explicitly rejected (on [Schultz's] behalf) any proposed compensation that would be based upon [Schultz's] salary."  Mem. Opin'n at 23 *referring to* Plt's 1st Opp'n, Ex. 9, Docket 24-4 at 28.

### 4.      The contract is uncertain and there is no agreement as to the nature of the subject TV show.

The District Court concluded that "this alleged contract has eluded precise definition and has been characterized by plaintiff in a variety of ways."  Mem. Opin'n at 18.  Queen testified that he had a verbal agreement with Schultz "[t]hat [they] were partners on **any television show**. . . ."  He also said the agreement provided "[t]hat we would be partners on **any television show**."  Landa 12/26/11 Decl. Ex. 1 (Queen transcr. 148:21-150:9), Docket 31-3 at 8 (emphasis added).  Queen explained that when he was talking about The Ed Show, he was talking about "**any television show involving Ed Schultz**."  *Id*. Ex. 1 (Queen transcr. 226:20-227:10), Docket 31-3 at 10 (emphasis added).

Queen's Brief is equally ambiguous and uncertain regarding the subject matter of the alleged contract.  On appeal, Queen argues that his responsibilities were to "develop **the Show**," "create a pilot of **the Show**," "attempt to sell **the**

**Show**," and ultimately to "split the profits from such sale 50/25/25." Plt's Init'l Brief at 18 (emphasis added). However, Queen's March 13, 2009 e-mail to Schultz demonstrates, at a minimum, his doubt that "the Show" refers to MSNBC's *The Ed Show*. Queen states that "[w]e have discussed and agreed to **ownership**, that is my renumeration (sic) would be 12%. **Does that apply to the MSNBC opportunity as *well*?**" Landa 11/1/11 Decl. Ex. 11, Docket 25-1 at 37 (emphasis added). That question is moot: it is undisputed that Schultz has no ownership position in *The Ed Show* that could be shared 50/25/25.

Schultz worked with Queen solely to create a Sunday morning TV show which would be owned, financed and produced by a proposed partnership or corporation. It never came to fruition because the money could not be raised. *Id.* Ex. 18 (May 10, 2009 email from Schultz to Queen) Docket 25-1 at 52. O'Connell's husband agreed with Schultz in his "ED DEAL RECAP to MQ." He acknowledged that the agency scenario ("Option 1") had fallen through so Queen's team shifted its focus to the ownership scenario, "Option 2." As he described it, "If [Queen's] team created a show for Ed to host, [Queen et al.] would own part of it and most likely jobs could be provided, if wanted at the time." He referred to this as "the Horlick deal" which he acknowledged fell through because production

20

money could not be raised.[6]  *Id.* Ex. 19, Docket 25-1 at 54.  Queen's testimony also

confirmed Schultz's premise.  Defendant's Controverting Evidence, Ex. 2 (Queen

transcr. 100:11-101:7; 106:2-107:3; 08:20-109:15), Docket 33-4 at 28-29.

### 5.     The contract is uncertain as to the performance required of Queen.

Queen could provide no certainty regarding what performance was required

of him under the contract.  In his complaint, Queen described his "adequate

consideration" merely as "detrimental reliance."  Compl. ¶81.  When asked to

describe each of his contractual responsibilities, Queen was just as ambiguous,

testifying that "[i]t was basically to **do anything and everything** I possibly could,

using the connections that I had to facilitate the possibility of bringing a television

show involving Ed Schultz to MSNBC, NBC, or the other networks."  He also said

that "[m]y responsibilities were **anything and everything** it would – took to get

him on television."  Landa 12/26/11 Decl. Exh. 1 (Queen transcr. 54:4-55:10),

Docket 31-3 at 5 (emphasis added).

On appeal, for the first time, Queen contends that his contractual obligations

were to "develop the Show," "create a pilot of the Show," and "attempt to sell the

show."  Plt's Init'l Brief at 18.  In support, Queen cites his own declaration, which

---

[6] The "ED DEAL RECAP" also raised the "possibility to sue [Schultz] regardless of the prospects of [succeeding on the merits]."  O'Connell's husband said a contingency lawyer could be found and Schultz would possibly settle "to avoid further hassle and legal expense."  Landa 11/1/11 Decl. Ex. 19, Docket 25-1 at 55.

has nothing to do with his alleged obligation to "develop the Show" or any other contractual obligation. Queen's Decl. ¶¶4, 5, 6, Docket 24-3 at 1-2. Queen also erroneously relies on Schindler's declaration, which does not pertain to Queen's contractual requirement to "develop the Show." It is ambiguous and does not tether any efforts to any specific project. Schindler Decl., Docket 24-1 at 1-2.

Queen disingenuously argues that his declaration demonstrates a contractual obligation to "create a pilot for the Show." Plt's Int'l Brief at 18. However, the declaration says nothing about the creation of the pilot being a contractual obligation. Queen Decl. ¶¶17, 18, 20, 21, Docket 24-3 at 4-5. Moreover, Queen's May 31, 2008 e-mail contradicts that assertion. He says, "[Queen is] willing to move forward **without a signed contract** on the condition that Ed will cover all costs of production [of the Pilot]." Landa 11/1/11 Decl. Ex. 6, Docket 25-1at 27 (emphasis added). Queen's contention is also belied in Schultz's June 7, 2008 e-mail telling Queen, ". . . let's draw up a short letter to join forces to produce the pilot with the **intention of doing a structured deal down the road if the show has potential**." Plt's 1st Oppo, Exh. 10, Docket 24-4 at 30 (emphasis added).

The District Court correctly opined that "the fact that [Schultz] agreed to produce the pilot in a joint venture . . . cannot create a genuine issue of fact regarding whether [Schultz] intended to be bound to a *different* agreement, *i.e.*, a

22

much broader agreement to give [Queen] 25% of his salary." Mem. Opin'n at 27 (emphasis in original). Clearly, the District Court was correct.

Finally, Queen argues that he was contractually obligated to "attempt to sell the Show." Plt's Init'l Brief at 18. Again, Queen erroneously relies on his declaration, which does not mention a contract or a specific agreement. It merely reflects acts that Queen alleges he performed. Queen Decl. ¶¶15, 16, 22, Docket 24-3 at 4, 5. The District Court properly rejected Queen's self-serving declaration.

### 6. Plaintiff's Brief consists of erroneous arguments bolstered by mischaracterized evidence to overcome the *certainty* requirements of an enforceable contract.

Queen claims that he entered into an oral contract to exclusively develop and sell "the Show" in January 2008. Plt's Init'l Brief § 3 at 17. Queen also asserts he had contractual obligations to "develop the Show," "create a pilot of the Show," "attempt to sell the Show," and "split the profits from such sale 50/25/25." *Id.* at 18. These arguments were not made in opposition to Schultz's motions for summary judgment. They are being advanced for the first time on appeal and should not be considered. Moreover, Queen's contentions are unsupported by the evidence.

Queen also argues that "the Show" was subject to a March 3, 2008 contract. Landa 12/26/11 Decl. Exh. 1 (Queen transcr. 142:15-143:2), Docket 31-3 at 7. However, there is no evidence to contradict Schultz's testimony that MSNBC's

23

*The Ed Show* was conceived and first broadcast in April 2009. Schultz Decl. ¶¶4, 6, 8, 9, Docket 31-2 at 2. Neither Queen's alleged January 2008 or March 3, 2008 contracts could have contemplated MSNBC's *The Ed Show*. Notably, Queen has not proffered corroborating evidence on this or any other issue from MSNBC, NBC, Horlick or Schindler.

### B.    THE CONTRACT IS UNENFORCEABLE BECAUSE THERE WAS NO INTENT TO BE BOUND.

The District Court stated more than one reason to dismiss Queen's claims. It opined that "even assuming *arguendo* that [Queen] had created a genuine issue of fact regarding agreement on material terms, his breach of contract claims would still not survive summary judgment because [Queen] has not created any genuine issue of fact regarding [Schultz's] intent to be bound." Mem. Opin'n at 25.

Plaintiff's Brief erroneously equates Queen's "intent to be bound" with Schultz's. The District Court found that approach "misunderstands the requirement of demonstrating an intent to be bound:"

> For [Schultz] to intend *to be bound* under contract law principles he must have manifested an intent not only to have the plaintiff perform some act; he must also display an intent to be bound to provide consideration *in return* for that act. This is why courts, including the District of Columbia Court of Appeals, describe an intent to be bound as "a *mutual* intent to be bound contractually." *Dyer v. Bilaal*, 983 A.2d 349, 357 (D.C. 2009)(emphasis in original). Mem. Opin'n at 26.

Queen's argument that there was a partnership is based on two opposing characterizations of the *tentative partnership agreement*. First, Queen argues that

his unilateral act of sending the tentative partnership agreement to Schultz  is

evidence of Schultz' intent.  Second, Queen argues that he "sent Schultz a

proposed written partnership agreement [the 'tentative partnership agreement']

[to] memorialize what had already been verbally agreed between them."  Plt's

Init'l Brief at 7, 8:¶a.   Neither of Queen's conclusions are supported by the

evidence.  Specifically, the "tentative partnership agreement" was incomplete,

unsigned, and expressly rejected by Schultz. Landa 11/1/11 Decl. Ex. 2, Docket

25-1 at 11-19; *see Id.* Exs. 3, 4, Docket 25-1 at 21, 23.

Queen's argument that his unilateral act demonstrates Schultz's intent to be

bound is inconsistent with District of Columbia law.  "[R]egardless of the parties'

actual, subjective intentions, the ultimate issue is whether, by their choice of

language . . . , they *objectively* manifest a mutual intent to be bound contractually."

*Dyer*, 983 A.2d at 357 (emphasis in original) (*quoting 1836 S. St. Tenants Ass'n,*

*Inc. v. Estate of B. Battle*, 965 A.2d 832, 837 (D.C. 2009)). "The intentions of

parties to a contract can be found from written materials, oral expressions, and the

actions of the parties."  *Duffy*, 881 A.2d at 637.

While Queen's brief argues his own manifestation of intent to be bound, the

documentary evidence, in Queen's own words, demonstrates otherwise:

> Subject: **Take a look . . .**  (emphasis in original) I was wondering if
> you could take a look at this ***tentative agreement*** and tell me what you
> think.  Will this work for you?  The sooner we all agree the better.  At
> the same time I don't want you to be uncomfortable with any of these

issues.  Let me know, Michael [Landa 11/1/11 Decl. Ex. 2 (March 11, 2008 Queen e-mail to Schultz), Docket 25-1 at 10 (bold italics added)]

On March 11, 2008, after receiving the *tentative agreement*, Schultz advised Queen that he had forwarded it to his attorney.  *Id.* Ex. 3, Docket 25-1at 21.  Later that same day, Schultz forwarded Landa's response to Queen, in which Landa criticized the *tentative agreement* with specificity and advised Schultz not to sign it.  *Id.* Ex. 4, Docket 25-1 at 23.

As if this were not enough, the March 11th exchange was superseded by several other proposals, none of which were accepted by Schultz or Queen. Schultz Decl. ¶¶2, 3, 5, 10, Docket 31-2 at 1,2.

Queen relies on his conclusory and self-serving declaration as evidence of Schultz's intent to be bound.  Specifically, Queen cites ¶7 (stating Schindler, Schultz and Queen were members of a partnership), ¶10 (stating Queen was unwilling to have Landa as a partner), and ¶11 (Queen mischaracterizing an e-mail entitled "Proposed Agency Agreement" offering "exclusive authority to negotiate a [TV] show with CNN. . . .").  As to the latter, the District Court correctly found that it was an unenforceable "agreement to agree."  Plt's First Opp'n, Exh. 3 (Landa March 16, 2008 e-mail), Docket 24-4 at 15; Mem. Opin'n at 27. Similarly, Queen relies upon ¶12 (stating Schultz told Schindler and Queen "that the three of us were partners in the [unidentified] project") and ¶18 (referring to a partnership several times).  Queen Decl. ¶¶7, 10-12, 18, Docket 24-3 at 2-5.  The District Court

26

properly concluded that these self-serving statements were not sufficient to establish Schultz's intent.

Misunderstanding the law and mischaracterizing the evidence, Queen asserts that "[t]hird parties [Schindler and Landa] also described and understood the relationship between Queen and Schultz to be a partnership." Plt's Init'l Brief at 10. Queen's theory is unsupported by the facts in at least two respects. First, Schindler admits he did not know Schultz, "[a]s I was unfamiliar with Mr. Schultz or his radio show, I was hesitant to join the project, however, with Mike's enthusiasm and persuasive 'pitch.' (sic) I agreed to partner in the project." Schindler Decl. ¶2, Docket 24-1 at 1. Second, when Schindler quit, he did not state that he was leaving the "partnership," as argued in Plaintiff's Brief; rather, Schindler stated that he told "Mike [he] was leaving the project. . . ." *Id.* at 1-2, ¶3; Plt's Init'l Brief at 10.

Queen, on appeal, argues that his production of the pilot demonstrated Schultz's intent to be bound to a partnership agreement. The District Court, relying on two e-mails,[7] correctly rejected this argument, holding that "[an agreement to produce the pilot] cannot create a genuine issue of fact regarding whether [Schultz] intended to be bound by a *different* agreement, *i.e.*, a much

---

[7] Queen's May 31st e-mail stating that he is "willing to move forward without a signed contract . . . ," Landa 11/1/11 Decl. Exh. 6, Docket 25-1 at 27; and Schultz's June 7th e-mail stating the agreement was limited to production of the pilot, Plt's 1st Opp'n, Exs. 10, 11, Docket 24-4 at 30, 32.

broader agreement to give [Queen 25%] of his salary." Mem. Opin'n at 27 (italics in original).

　　In opposing summary judgment, Queen relied "heavily" on two e-mails to establish Schultz's intent to be bound. *Id.* at 26. The first was a March 16, 2008 e-mail that said "[Landa] would agree to having Ed sign" a "letter of understanding" wherein Schultz, Queen and Schindler would "agree to form a partnership or corporation . . . for any [TV] opportunities [resulting] from this agreement." Plt's 1st Opp'n, Ex. 14, Docket 24-4 at 39. The second was an April 22, 2008 e-mail in which Schultz tells Queen, "[t]he networks is (sic) our only chance. Hopefully Fox or MSNBC will come through." *Id.* Ex. 5, Docket 24-4 at 19. The District Court correctly shrugged both off as merely an "unenforceable 'agreement to agree' at best" and "a mere statement of optimism untethered to any particular agreement or understanding." Mem. Opin'n at 27.

　　Queen also argued below that his own acts demonstrated Schultz's intent to be bound, i.e., "he pitched the show to various NBC and MSNBC officials, including Tim Russert, Phil Griffin, Jeff Zucker, and Steve Capus." Plt's 2nd Oppo, Docket 32 at 33 *citing* Plt's 2nd Oppo. Exh 1 (Queen's transcr. 39:12-22), Docket 32-1 at 5. The District Court correctly stated that "[e]ven less helpful [than creating the pilot] is the evidence that [Queen] subsequently 'pitched' the show to several networks because, even assuming [Queen] intended to be bound, the crux

of this dispute is whether [Schultz] intended to be bound, which the plaintiff's actions cannot illuminate."  Mem. Opin'n at 27.

As discussed, a variety of proposals and requests for a written contract superseded the March 2008 50/25/25 e-mail.  This, the District Court correctly observed, reflects both Schultz's and Queen's intent not to be bound until a "formal writing was executed."  *Id.* at 28 *citing Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C. 1981) ("[S]ubsequent negotiations about drafts of a written sales commission agreement reflect the parties' intention not to be bound until a formal writing was executed."); *see also Jack Baker*, 664 A.2d at 1239 ("[P]arties will not be bound to a preliminary agreement unless the evidence presented clearly indicates that they intended to be bound at that point.").

## II.   THE DISTRICT COURT CORRECTLY HELD THAT THERE WAS NO VALID AND ENFORCEABLE PARTNERSHIP AGREEMENT BETWEEN SCHULTZ AND QUEEN.

Queen stated that "Schultz and [Queen] had an oral agreement and a written agreement [through a series of e-mails] to enter into a partnership with Schindler for the development and production of any TV show featuring Schultz . . . ." Queen's Decl. ¶31, Docket 32-2 at 8.  Queen also stated that he "contacted various TV networks as a partner of Schultz and Schindler . . . ."  *Id.* ¶31, Docket 32-2 at 8. These two statements correctly prompted the District Court to analyze the breach of contract claims under a partnership theory.  Mem. Opin'n at 28-29.

29

The District Court observed "that, under a partnership theory, the only arrangement between [Schultz and Queen] that makes sense based on the evidentiary record is that the proposed 'partnership' would have been formed for the purpose of producing a television show that would be *owned* by the partnership and then syndicated." Mem. Opin'n at 30.

### 1.    Because there is no evidence of co-ownership, there are no facts supporting formation of a partnership.

The "well-settled distinction between a partnership relationship and an employment relationship" is "co-ownership." Mem. Opin'n. at 30 (*citing e.g.*, *In re KeyTronics*, 744 N.W.2d 425, 441 (Neb. 2008)) (citation omitted). The District Court stated:

> . . . insofar as [Queen] claims [entitlement] to a portion of [Schultz's] *salary* as a result of a partnership, his partnership theory is a non-starter. Any such claim would necessarily have to be based on some kind of agency services contract because **[Queen] has presented no evidence or legal authority to support the notion that he has (or could have) a proprietary interest in or co-ownership of [Schultz's] employment**. Mem. Opin'n at 31 (emphasis added).

Queen's claim that his partnership with Schultz entitles him to a percentage of profits from MSNBC's *The Ed Show* (or any other show) "is foreclosed by the undisputed facts in this case: [Schultz] has no ownership interest in 'The Ed Show' nor any entitlement to receive a share of its profits." *Id.* at 31 *citing* First Schultz Decl. ¶¶8-9.

30

The District Court correctly concluded that Schultz and Queen's "relationship cannot be a partnership because it is not a co-owned business – it is an employment relationship."  Mem. Opin'n at 30.

> **2.    Queen's argument in support of partnership formation also fails because there is no genuine issue of material fact about Schultz's intent.**
>
> > **a.    The District Court correctly found that Queen failed to create a genuine issue of fact about whether the parties intended to form a partnership.**

Queen's brief does not address the fact that a partnership requires co-ownership.  The District Court gave a second reason for dismissal when it said that "even if a partnership theory were applicable to the facts of this case, [Queen] has nevertheless failed to create a genuine issue of fact regarding whether the parties intended to form a partnership."  District of Columbia law is clear.  "In general, the courts, in determining objective partnership intent, look for the presence or absence of the attributes of co-ownership, including profit and loss sharing, control, and capital contributions."  Mem. Opin'n. at 29 *citing Beckman*, 579 A.2 at 627.  "The communications between the parties consistently display a relationship that was devoid of any indicia of a partnership, most notably the sharing of profits and losses, control, and capital contributions."  Mem. Opin'n at 31-32.

Queen erroneously argues without authority that the parties' and third persons' subjective characterizations of Schultz and Queen's relationship should

31

trump the *Beckman* factors discussed above.  While the parties' characterizations of their relationship may be probative, "the question ultimately is objective: did the parties intend to do the acts that in law constitute partnership?"  As discussed above, the District Court correctly rejected Queen's self-serving declaration as well as the e-mail correspondence he preferred as supporting evidence.

The District Court also discounted Queen's theory that 50/25/25 profit sharing satisfied the profit sharing indicia.  Queen supported his argument by citing D.C. CODE § 33-102.02(c)(3) (2001), which was repealed.  Queen also relied upon his declaration's self-serving statement that "[the parties] agreed that in addition to salaries, [Queen] would receive 25%, Schindler would receive 25%, and Schultz would receive 50% of income realized by the program after expenses, should it be sold."  Queen's Decl. ¶8, Docket 24-3 at 2.

The District Court rejected Queen's argument, stating that "when one person merely performs the service of procuring employment for another person, it stands to reason that such a relationship cannot be a partnership because it is not a co-owned business – it is an employment relationship.  **This would be true even if the agent's compensation were based on the profit of a resulting employment opportunity**."  Mem. Opin'n at 30 (emphasis added) *citing Chase & Co. v. White, Weld & Co.*, 311 F. Supp. 1253, 1259 (S.D.N.Y. 1970), "[a] person who has no

proprietary interest in the business save to share profits as a compensation for services is not a partner or joint venturer."  D.C. CODE § 29-602.02(c)(3).

On appeal, Queen argues that the District Court was wrong in its analysis when it said;

> "In objectively analyzing the traditional elements of the formation of a partnership, the District Court failed to recognize: a) the parties' own characterization of the relationship; b) that no profits were ever realized, but the parties agreed to split the profits; c) the substantial decisions made by and control exerted by Queen throughout the development of the Show; and d) that Queen's time, energy, and resources constitute capital contributions and loss sharing."  Plt's Init'l Brief at 5.

In support, Queen again relies on the repealed D.C. Code section and his self-serving declaration.  Plt's Init'l Brief at 11-12, 13-15.  He also relies on his mischaracterization of *Beckman*, 579 A.2d at 628.  The District Court correctly rejected Queen's interpretation, explaining that "[a] person who has no proprietary interest in the business save to share profits as a compensation for services is not a partner or joint venturer . . . ."  Mem. Opin'n at 30 (citation omitted).  This court should affirm that decision because Queen has offered no compelling reason to reverse it.

The District Court also pointed out that "communications between the parties illustrate a relationship in which [Schultz] retained all meaningful control over how the 'business' was run.  In a poignant example, one iteration of Queen's business proposal conceded in relevant part that 'Ed would have total control of

content, hiring, [and] production decisions.'" *Id.* at 32 referring to Plt's First Oppo'n Ex. 6.

In an attempt to establish error, Queen argues that "Queen only ceded control as to the creative and hiring decisions for the Show **after its production**." Plt's Init'l Brief at 12 (emphasis added). The argument is unsupported by any evidence. The only *production* was the pilot. As discussed above, the pilot was subject to a limited agreement that the District Court found cannot create a genuine issue of fact about whether Schultz intended to be bound by a different and much broader agreement. Mem. Opin'n at 27.

The District Court also analyzed profit and loss sharing and correctly found that Queen "never made any capital contributions." *Id.* at 32. Queen argues for the first time on appeal that, rather than considering capital contributions, the District Court should have considered "that the partnership benefitted from the advancement of funds by Queen to the partnership" before Schultz reimbursed him for the pilot. Plt's Init'l Brief at 14. Since the argument was not advanced below, it should not be considered here. Further, the belated argument lacks legal merit, and Queen cited no authority to support it.

Finally, the District Court correctly ignored Queen's expert's statement, which opines that Queen is a "production partner, partner in a joint venture, executive producer, creator of a production and/or a joint venture participant . . ."

34

because these are legal conclusions that Robinson is not competent to make.

Expert Witness Statement, Docket 32-3 at 19.

## CONCLUSION

The District Court held that the contract claims should be dismissed on either of two grounds.  First, Queen "has failed to create a genuine issue of material fact regarding the existence of a contract because he has presented no evidence that the parties agreed on all of the material terms of the alleged agreement."  Mem. Opin'n at 31.  In fact, Queen presented no evidence that any material terms were agreed upon.  Second, "[Queen] has not created any genuine issue of fact regarding [Schultz's] intent to be bound."  Mem. Opin'n at 25.

The District court held that there was no partnership on four grounds.  First, the alleged partnership mandated ownership, and Schultz had no ownership interest in MSNBC's *The Ed Show*.  Second, the District Court stated that "[e]ven if a partnership theory were applicable to the facts of the case, the plaintiff has nevertheless failed to create a genuine issue of fact regarding whether the parties intended to form a partnership.  Mem. Opin'n at 31-32.  Third, Queen cannot be entitled to a percentage of Schultz's salary as a result of the partnership because it "would necessarily have to be based on some kind of written agency services contract and [Queen] has presented no evidence or legal authority to support the notion that he has (or could have) a proprietary interest in or co-ownership of

[Schultz's] *employment*.  Mem. Opin'n at 31 (emphasis in original).  Fourth, "the communications between the parties consistently display a relationship that was devoid of any indicia of a partnership, most notably the sharing of profits and losses, control, and capital contributions."  Mem. Opin'n at 32.

The District Court was correct, and the lower court should be affirmed.

Dated:  March 4, 2013                    Respectfully submitted,

                                         /s/ John C. Hayes, Jr.
                                         John C. Hayes, Jr. (DC Bar No.183582)
                                         NIXON PEABODY, LLP
                                         401 9th Street, N.W., Suite 900
                                         Washington, D.C.  20004
                                         Telephone: (202) 585-8345
                                         Facsimile: (202) 585-8080
                                         E-mail: jhayes@nixonpeabody.com

                                         *Attorney for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*8,748*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: March 4, 2013                    /s/ John C. Hayes, Jr.
                                        *Counsel for Appellee*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 4th day of March, 2013, I caused this Page-Proof

Brief of Appellee to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to the following registered

CM/ECF users:

> Steven W. Teppler
> KIRK PINKERTON, PA
> 240 South Pineapple Avenue, 6th Floor
> Sarasota, Florida  34236
> (941) 364-2400
>
> Frazer Walton, Jr.
> LAW OFFICE OF FRAZER WALTON, JR.
> 920 Burns Street, S.E.
> Washington, D.C.  20019
> (202) 584-7572
>
> *Counsel for Appellant*

I further certify that on this 4th day of March, 2013, I caused the required

copies of the Page- Proof Brief of Appellee to be hand filed with the Clerk of the

Court.

/s/ John C. Hayes, Jr.
*Counsel for Appellee*
